

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-19-00225-CR

WILLIAM B. GLASSCOCK, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 241st District Court
Smith County, Texas
Trial Court No. 241-0709-19

Before Morriss, C.J., Burgess and Stevens, JJ.
Memorandum Opinion by Justice Burgess

## MEMORANDUM OPINION

A Smith County[1] jury found William B. Glasscock guilty of one count of continuous sexual abuse of R.C., a child under fourteen years of age, as charged in the indictment in this case.[2] The trial court sentenced Glasscock to imprisonment for life. On appeal, Glasscock argues that (1) the evidence supporting his conviction is legally insufficient; (2) the trial court erred by admitting a list of pornographic websites accessed by Glasscock on his computer, marked as State's Exhibit 2, together with testimony related thereto; and (3) the trial court erred by admitting testimony regarding Glasscock's previous failure to appear for court proceedings. We affirm the trial court's judgment because we find sufficient evidence to support Glasscock's conviction, any error by the trial court in admitting State's Exhibit 2 was harmless, and the trial court did not err in admitting testimony regarding Glasscock's previous failure to appear for court proceedings.

## I. Factual and Procedural Background

Because Brandy and her husband worked odd hours, their children, R.C. and Brent, frequently stayed after school and overnight at the nearby home of their grandmother, Emily, and her seventy-year-old husband, William Glasscock. The children stayed there so often that they had their own rooms.

---

[1]This case was transferred to this Court from the Twelfth Court of Appeals in Tyler as part of the Texas Supreme Court's docket equalization program. *See* TEX. GOV'T CODE ANN. § 73.001. We are unaware of any conflict between the precedent of the Tyler court and the precedent of this Court on any issue relevant to this appeal. *See* TEX. R. APP. P. 41.3.

[2]To protect the victim's privacy, we have assigned pseudonyms to the victim and her relatives, other than Glasscock. *See* TEX. R. APP. P. 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

At a family party on or about April 1, 2018, R.C. told a small group of family members that Glasscock had been inappropriately touching her by sticking his hand inside her pants and that he had been doing so for four to six years. The first person R.C. told was her friend's mother, Debra. Debra, who was also Glasscock's niece, initially did not believe the allegations because R.C had exhibited attention-seeking behavior in the past. Debra testified that, when R.C. made the accusation against Glasscock, she told Emily, who said she would "handle it." Nevertheless, neither Debra nor Emily reported R.C.'s allegations about Glasscock to the police.

On April 12, 2018, Brandy learned of the abuse through several text messages with R.C. Brandy testified that R.C. told her that Glasscock had been touching her private parts but that she did not want to talk about it and refused to go into a lot of detail. When Brandy asked R.C. if Glasscock had ever put his fingers inside her, she said, "No." Later that day, when Brandy spoke with R.C. in person, the child said that Glasscock would "grab her. She would try to get out of the house and he would grab her and start putting his hands in her pants." Brandy testified that the story R.C. told her had not changed.

According to Brandy, R.C. could not remember the first time it happened, but estimated that the abuse had been going on since she was about ten years old—"maybe four to six years." She also said that the last time it happened was in late January 2018, the night their dog, Sarge, died. Brandy informed her husband what R.C. had said and then contacted the Smith County Sheriff's Office. The sheriff's office interviewed R.C. and her family and began an investigation. Glasscock was later arrested and eventually charged with continuous sexual abuse of a child under

3

fourteen years of age. At the time of his arrest, Glasscock told the officers that he knew this was coming.

Jennifer Subin performed a forensic interview of R.C. at the Children's Advocacy Center. Subin testified that R.C. was in a state of "tentative disclosure" regarding what happened and was "very reluctant to talk." Subin also testified that R.C. was "putting internal pressure on herself" due to her feelings for and relationship with Glasscock. Subin described R.C. as "shutoff, withdrawn," and "very quiet, very meek and mild" to the point that it was "difficult to even hear her tell . . . what had happened." R.C. avoided giving details of the abuse by saying that "it was the same way every time." Subin testified that such avoidance is common among kids who have suffered repeated sexual abuse. Subin explained, "It's hard for them to separate those events in their mind when it's something that's routinely happening to them." Subin added that this concept is known as source confusion. She explained that, if someone had been abused from the time of elementary school through age thirteen, she "would expect them to have kind of a confused or jumbled timeline of events."

Although R.C. did not remember providing this detail to Subin, Subin testified that R.C. said Glasscock had repeatedly penetrated her with his fingers. Subin said R.C. was "pretty clear" and "adamant about what had happened" and that the only time penetration did not occur was the night their dog died. Although R.C.'s timeline of when the abuse started and what happened was vague, she was able to provide details about "location, how it felt, things that were going on in the room, things that were going on at night before and after the event, specifically the last events."

4

Subin testified that R.C.'s story was consistent throughout the interview and that she saw no indication that the story was fabricated.

Emily testified that she and Glasscock slept in different bedrooms and that Glasscock's room was "at the far end of the house" near R.C.'s bedroom. According to Emily, R.C. claimed that Glasscock would go into her bedroom at night and touch her and that, during the day, he would "catch her going out the front door and put his hands down her pants and panties and touch her." R.C. also told her that it had happened several times but that the first time she remembered it happening was about the time of her elementary school photograph. Emily testified that the school photo that R.C. referred to was taken in 2014, when R.C. was ten years old. Emily never suspected the abuse, but she did remember R.C. often sleeping in her bed with her and asking if she was a light sleeper.

Emily testified that she did not call the police because "part of [her]" believed that the person she had been married to since 1994 "could never have done this." Even though she and Glasscock continued to live in the same house, they did not speak to one another for several days after R.C.'s outcry. Emily added that, when she, Glasscock's sister, and Emily's brother-in-law confronted Glasscock on April 10, 2018, and asked if the allegations were true, Glasscock went into his bedroom and closed the door and "never said a word, nothing, no denial, no nothing." She testified that she spoke with him again later and asked him if he had touched R.C. and that Glasscock said, "I did it." When she asked why he did it, he told her, "To feel the love." He also told her he had been molested by an uncle and that he had been dealing with that for much of his life.

5

At trial, R.C. testified that "pretty much every day," when she was about to leave Emily's house and go home, Glasscock would "corner" her by the door, put his hand inside her panties, and rub her vagina with his fingers. However, she said, "He never stuck anything in me," but "[h]e would rub . . . [m]y vagina." Subin said that this testimony was neither troubling nor a red flag because it would be "very difficult for [her] to talk about sexual abuse and digital penetration in front of a room full of [strangers]." According to Subin, it is "very normal for children to minimize what's happened to them [and answer questions differently] when they've had to talk to different professionals repeatedly and then they're asked to articulate that in a court room."

R.C. testified that the abuse happened many times but that she did not remember the first time it happened. She could not remember how old she was or in what school years the abuse took place, but she said she was "pretty sure" that it had been going on since she was in elementary school. However, R.C. contradicted this testimony during cross-examination when she said that Glasscock only touched her during a two-week period, that at the end of those two weeks, she stopped going to Emily's house for a while, and that Glasscock touched her or tried to touch her once more after she had resumed going to Emily's house.

R.C. testified that she would sleep with Emily or set an alarm in the morning so that she could go home as soon as her mother returned in order to avoid being around Glasscock. R.C. also testified that the last time Glasscock touched her was in January 2018, on the night the family dog died. At that time, she was thirteen years old. R.C. testified that Glasscock came into her room that night and that she pretended to be asleep. She said that he "kept on trying to stick his hand

down [her] pants but he never fully successfully did it" because she was "tossing and turning," trying to fight him off.

## II. R.C.'s Testimony Does Not Require Corroborating Evidence

In his first point of error, Glasscock argues that the evidence supporting his conviction is legally insufficient.[3] We disagree.

### A. Standard of Review

"In evaluating legal sufficiency, we review all the evidence in the light most favorable to the trial court's judgment to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt." *Williamson v. State*, 589 S.W.3d 292, 297 (Tex. App.—Texarkana 2019, pet. ref'd) (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (plurality op.); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd)). "Our rigorous [legal sufficiency] review focuses on the quality of the evidence presented." *Id*. (citing *Brooks*, 323 S.W.3d at 917–18 (Cochran, J., concurring)). "We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury 'to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate

---

[3]Glasscock also argues that "R.C.'s testimony itself was vague." However, he fails to adequately brief this argument. Appellant must provide a brief containing "clear and concise argument[s] for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). "When a party raises a point of error without citation of authorities or argument, nothing is presented for appellate review." *State v. Gonzalez*, 855 S.W.2d 692, 697 (Tex. Crim. App. 1993). Here, Glasscock fails to cite to the record or authority in support of this argument, fails to explain how R.C.'s testimony was vague, and fails to analyze how the alleged lack of specificity in her testimony rendered the evidence insufficient to support the verdict. Accordingly, Glasscock's argument that R.C.'s testimony is vague is inadequately briefed and need not be addressed. *Sierra v. State*, 157 S.W.3d 52, 64 (Tex. App.—Fort Worth 2004), *aff'd*, 218 S.W.3d 85 (Tex. Crim. App. 2007); *see* TEX. R. APP. P. 38.1(h).

facts." *Id*. (quoting *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)).

"Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge." *Id*. at 298 (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "The 'hypothetically correct' jury charge is 'one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Id*. (quoting *Malik*, 953 S.W.2d at 240). According to a hypothetically correct jury charge in a case alleging continuous sexual abuse of a child under the age of fourteen, the State must prove beyond a reasonable doubt that, (1) during a period of thirty days or more, (2) the defendant committed two or more "acts of sexual abuse" and, (3) at the time of each act, the defendant was at least seventeen years old or older and the victim was a child younger than fourteen years of age. *See* TEX. PENAL CODE ANN. § 21.02(b).

B.     **Application and Analysis**

Glasscock contends that the evidence is insufficient because R.C.'s testimony was not corroborated by any physical or eyewitness testimony. However, the law is settled that the testimony of a child victim, standing alone, is sufficient to support a conviction for continuous sexual abuse of a child, and there is no requirement that the victim's testimony be corroborated by medical or physical evidence. TEX. CODE CRIM. PROC. ANN. art. 38.07 (Supp.); *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978); *Kemple v. State*, 725 S.W.2d 483, 485 (Tex. App.— Corpus Christi 1987, no pet.). Therefore, we overrule this point of error.

8

**III.     Any Alleged Error in Admitting State's Exhibit 2 Was Harmless**

In his second point of error, Glasscock contends that the trial court erred under Rule 403 of the Texas Rules of Evidence in admitting State's Exhibit 2, which was a list of pornographic websites found in the search history of Glasscock's computer, together with accompanying testimony. Glasscock argues that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice.[4] We disagree.

**A.     Standard of Review**

We review a trial court's Rule 403 determination for abuse of discretion.[5] *Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990); *see Wheeler v. State*, 67 S.W.3d 879, 888 (Tex. Crim. App. 2002); *Hartsfield v. State*, 305 S.W.3d 859, 873 (Tex. App.—Texarkana 2010, pet. ref'd). In resolving this issue, we analyze the following factors:

> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. Of course, these factors may well blend together in practice.

---

[4]"'[U]nfair prejudice' refers to 'an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one.'" *Erazo v. State*, 144 S.W.3d 487, 501–02 (Tex. Crim. App. 2004) (Cochran, J., concurring) (quoting *Rogers v. State*, 991 S.W.2d 263, 266 (Tex. Crim. App. 1999)); *accord Cohn v. State*, 849 S.W.2d 817, 820 (Tex. Crim. App. 1993).

[5]As noted by the Texas Court of Criminal Appeals,

> Rule 403's use of the word "may:" reflects the draftsman's intent that the trial judge be given very substantial discretion in "balancing" the probative value on the one hand and the unfair prejudice on the other, and that he should not be reversed simply because an appellate court believes that it would have the matter decided differently.

*Powell v. State*, 189 S.W.3d 285, 288–89 (Tex. Crim. App. 2006).

*Giglioblanco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).[6]

**B.      Analysis**

Justin Hall, a detective with the Smith County Sheriff's Office who deals primarily with cyber-crimes, examined Glasscock's laptop computer and extracted a list of websites from Glasscock's internet browser history, which the State offered as State's Exhibit 2. The list included sites such as younglittlegirlies.com, tinyteentitties.net, tight-teenies.com, so-so-young.com, and nudeteenphoto.com. Hall testified that State's Exhibit 2 demonstrated that Glasscock had viewed various pornographic videos including "'school girl' -- and just going to say effed -- by 'neighbor,'" "[s]leeping babe effed by elderly man," and "[t]eenie gets creamed asleep." Hall testified that, based on his training and experience, he understood the word "creamed" to be a pornographic euphemism for someone ejaculating on another. Hall then testified that considering the particular allegations in this case, the types of sites and videos listed in State's Exhibit 2 tended to corroborate R.C.'s allegations against Glasscock.

Glasscock timely objected to the list and testimony regarding it, arguing that the evidence was inadmissible under Rule 403. The State argued that considering the charge and Glasscock's

---

[6] Nevertheless,

> the trial court need not conduct a formal 403 hearing and "is not required to place the results of its balancing test on the record." *Colvin v. State*, 54 S.W.3d 82, 85 (Tex. App.—Texarkana 2001, no pet.) (citing *Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997). "Rather, the trial court is presumed to engage in the required balancing test once a party objects on the ground of Rule 403 and the trial court rules on the objection, unless the record indicates otherwise." *Id.* For that reason, "where nothing in the record shows the trial judge did not perform the balancing test, we have found no error when the judge simply listened to the defendant's objections, then overruled them." *Brown v. State*, No. 06-18-00151-CR, 2019 WL 942882, at *1 (Tex. App.—Texarkana Feb. 27, 2019, no pet.) (mem. op., not designated for publication) (citing *Rojas v. State*, 986 S.W.2d 241, 250 (Tex. Crim. App. 1998)).

*Brown v. State*, 2019 WL 942882 (Tex. App.—Texarkana Feb. 27, 2019, no pet.).

and R.C.'s ages, it had culled down the list of sites in Exhibit 2 to only those websites related to "young teen, prepubescent, school-girl type" of content, that "other types of pornographic materials" were not on the list, and that the list was "absolutely probative . . . to show [Glasscock's] intent" and that "he [had] a sexual desire for young children." The trial court overruled Glasscock's objection, and State's Exhibit 2 was admitted into evidence.

The Texas Court of Criminal Appeals has noted that "[v]irtually all evidence that a party offers will be prejudicial to the opponent's case, or the party would not offer it." *Casey v. State*, 215 S.W.3d 870, 883 (Tex. Crim. App. 2007). Thus, the question presented under Rule 403 is not whether evidence is prejudicial, but whether it is *unduly* prejudicial. In this case, Glasscock argues that the evidence was unduly prejudicial because he "was not charged with possession of child pornography" and there was no evidence that the sites he visited contained child pornography. Accordingly, Glasscock maintains that the list "distracted the jury from the main issue." Nevertheless, we do not address this issue because, even if the trial court erred in admitting State's Exhibit 2 and Hill's testimony, that error would be harmless.

### C.     Harmless Error Analysis

A violation of an evidentiary rule that results in the erroneous admission of evidence is not constitutional error. *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998). When a nonconstitutional error is made during trial, it will be disregarded as harmless if the error did not affect the substantial rights of the defendant. TEX. R. APP. P. 44.2(b); *see* TEX. R. EVID. 103(a); *Garcia v. State*, 126 S.W.3d 921, 927 (Tex. Crim. App. 2004). A substantial right is implicated when the error had a substantial and injurious effect or influence in determining the jury's verdict.

11

*King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997). In weighing harm, we consider everything in the record, including the evidence, the character of the alleged error and how it might be considered together with the other evidence in the case, the jury instructions, the State's theory, any defensive theories, closing arguments, voir dire, and whether the evidence of guilt is overwhelming. *Motilla v. State*, 78 S.W.3d 352, 355–58 (Tex. Crim. App. 2002). In making that determination, this Court is not concerned with whether there was sufficient evidence on which Glasscock could have been convicted, but rather, whether there is a reasonable possibility the impermissible testimony might have contributed to the conviction. *See Lopez v. State*, 288 S.W.3d 148, 178 (Tex. App.—Corpus Christi 2009, pet. ref'd).

Other than the disputed evidence, the State's evidence in the case consisted primarily of witness testimony. The defense's primary theory was that there was reasonable doubt as to whether Glasscock committed continuous sexual abuse because R.C. denied that Glasscock ever penetrated her with his fingers, and she denied that Glasscock touched her vagina on the final night of the alleged abuse. Glasscock contended that R.C.'s testimony regarding the particular abuse, the timeline of events, and that the period of the abuse was unclear was not credible and was insufficient to prove his guilt beyond a reasonable doubt as charged by the indictment. Glasscock also challenged the credibility of the witnesses, particularly questioning why Emily and other family members waited to contact the police after learning of R.C.'s accusations against Glasscock.

The State primarily focused its case on the testimony of R.C., Subin, Brandy, and Emily, particularly Emily's testimony that Glasscock confessed his guilt to her. During closing

12

arguments, in addition to the witness testimony, the State raised the issue of Glasscock's internet searches, arguing,

[H]e has searched videos fantasizing about a neighbor, like he is to [R.C.], with a school girl. Well, doesn't that seem a little too close to what actually happened to be a coincidence? What else has he searched? Sleeping babe effed by elderly man.

. . . .

And right below it there, another what I would submit is fantasizing about raping people who are asleep or at least doing things that are very close to it while they're asleep. It fits so well with the testimony. This is his fantasy. This is what he gets off on, and he's been doing it for years.

Four of the websites found listed on State's Exhibit 2 were briefly raised again in the State's final closing argument:

And I want briefly to talk about what William Glasscock told y'all. See, I think the most honest thing that someone can say is how they behave when no one's looking. So think about that. When [R.C. is] not there, when he doesn't have somebody to touch, to force into a corner, he gets on his laptop. What's he look up? tinyteentitties.net, younglittlegirlies.com, youngest temptations, so-so-young.com. And then, when it's time for the pretrial or plea hearing, he gets in his car and leaves.

The jury charge itself is not pertinent to this analysis. However, during jury deliberations, the jury sent two notes to the court asking for R.C.'s testimony and specifically inquiring about "what happened on the night the dog passed away and the part of the testimony on the 2–3 wk [sic] period that this only occurred during [R.C.'s] testimony." There is no indication that the jury placed any particular emphasis on State's Exhibit 2 or Hill's testimony.

Finally, the evidence of guilt in this case is very strong. R.C. testified that Glasscock had touched her vagina for years. Subin testified regarding R.C.'s detailed accounts of the abuse she suffered, including digital penetration by Glasscock. When family members confronted Glasscock

13

with the allegations, he refused to speak and left the room, but he never denied the allegations. Emily testified that Glasscock confessed his guilt to her, saying that he "did it" so he could "feel the love." When Glasscock was arrested, he told the officers that he knew the arrest was coming. Furthermore, on the day of a pretrial hearing, rather than driving to the courthouse, Glasscock got in his truck and left the state.

Based on the foregoing, we have fair assurance that the admission of the disputed evidence did not have a substantial or injurious effect in determining the jury's verdict. *Motilla*, 78 S.W.3d at 355; *Broderick v. State*, 35 S.W.3d 67, 74 (Tex. App.—Texarkana 2000, pet. ref'd) (citing *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998)). Therefore, any error in admitting the disputed evidence was harmless and must be disregarded. *See* TEX. R. APP. P. 44.2(b). Accordingly, we overrule this point of error.

## IV. The Trial Court Did Not Err in Admitting Testimony of Glasscock's Failure to Appear

In his final point of error, Glasscock, argues that the trial court violated Rule 403 in admitting evidence regarding his prior failure to appear in court. We disagree.

### A. Standard of Review

As noted above, we review a trial court's Rule 403 determination for abuse of discretion under the *Montgomery* factors. *Montgomery*, 810 S.W.2d at 391. Over Glasscock's Rule 403 objection, two witnesses testified, and exhibits were admitted into evidence, regarding Glasscock's

14

absence from a previous pretrial hearing in this case and his subsequent arrest.[7] Tabitha Freeman, the court coordinator for the 241st Judicial District Court of Smith County, Texas, testified that despite being properly notified through his counsel, Glasscock was not present at the final pretrial hearing on April 3, 2019. At the time, Glasscock's trial was set for the following Monday, April 8, 2019 . The trial court took judicial notice that Glasscock was absent and "had absconded from the jurisdiction of the Court, which resulted in the Court forfeiting the bond and issuing a warrant for [Glasscock's] arrest."

**B.      Analysis**

Greg Roberts, an officer with the Tyler Police Department assigned as a special deputy to the Joint East Texas Fugitive Task Force with the United States Marshals Office, testified that, after Glasscock failed to appear at the hearing, he and other officers immediately began searching for him. He was not at Emily's home or the hotel where he had been staying. Emily told the officers that Glasscock "may have some suicide-by-cop ideations."

Roberts testified,

[A]nytime . . . that a person is on the run for a violent felony offense, they're already dangerous. But if a person expresses some type of suicidal or homicidal ideation, it's very dangerous for us because when we encounter that person it's going to come in to factor in how we handle it.

The officers initially located Glasscock driving on Interstate 20 towards Louisiana by pinging his cell phone. Glasscock's truck was spotted in the parking lot of a Shreveport casino, where he

---

[7]The trial court took judicial notice of "the prior proceedings on the record in this case" and found that evidence of Glasscock's flight was relevant and probative and that "its probative value outweigh[ed] any chance of unfair prejudice."

apparently had spent a few days. On May 8, 2019, Glasscock was arrested without incident at a gas station in Lindale, Texas.

While flight alone is not dispositive of guilt, a defendant's flight is an action from which an inference of guilt may be drawn. *Bigby v. State*, 892 S.W.2d 864, 884 (Tex. Crim. App. 1994); *Foster v. State*, 779 S.W.2d 845, 859 (Tex. Crim. App. 1989). Evidence of flight "goes to the very guilt of appellant," and unlike other extraneous offenses, it "shows a consciousness of guilt of the crime for which [Glasscock] is on trial." *Bigby*, 892 S.W.2d at 884. Therefore, evidence of Glasscock's flight had probative value because it concerned a fact of consequence, his guilt.

Moreover, the State needed the evidence to further substantiate its case because R.C.'s testimony, while alone sufficient to support a finding of guilt, was somewhat conflicting. In addition, the State took little time developing the evidence. Finally, evidence of Glasscock's flight probably had little potential to confuse the jury or impress the jury in some irrational, yet indelible, way because Glasscock never denied R.C.'s allegations even after being asked, and he even admitted his guilt to Emily. Although the evidence of Glasscock's flight indicates some degree of appellant's guilt, it "is not the type of misconduct that can be said to have great unfair prejudicial danger." *Hyde v. State*, 846 S.W.2d 503, 505 (Tex. App.—Corpus Christi 1993, pet. ref'd). Therefore, the probative value of evidence of Glasscock's flight was not substantially outweighed by the danger of unfair prejudice.

Finding no clear disparity between the evidence's danger of unfair prejudice and its probative value, we find that the trial court was within its discretion to admit evidence of

Glasscock's flight.  *See Hammer*, 296 S.W.3d at 555 (quoting *Conner v. State*, 67 S.W.3d 192, 202 (Tex. Crim. App. 2001)).  Accordingly, we overrule this point of error.

## V.       Conclusion

For the foregoing reasons, we overrule Glasscock's points of error and affirm the trial court's judgment.


                                                        Ralph K. Burgess
                                                        Justice


Date Submitted:        March 23, 2020
Date Decided:          August 11, 2020

Do Not Publish